IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



ANDRE RICHARD CLARKE,

      Petitioner,

v.

Criminal No. 3:15CV732

JOHN R. KUPLINSKI,[1] et al.,

      Respondents.

## MEMORANDUM OPINION

This matter is before the Court pursuant to Petitioner Andre Richard Clarke's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 ("§ 2241 Petition," ECF No. 1). Respondents have filed a Response. (ECF No. 9.) Clarke has filed a Reply. (ECF No. 10.) The matter is ripe for disposition.

---

[1] Clarke originally named Jeffrey Crawford, Director of the Farmville Detention Center, as a Respondent in this matter. Clarke has filed an Unopposed Motion to Amend Party to Petition for Habeas ("Unopposed Motion to Amend," ECF No. 6). Clarke seeks to substitute John R. Kuplinski, Superintendent of the Virginia Peninsula Regional Jail ("VPRJ"), for Crawford, because Clarke is currently detained at the VPRJ. (Id. at 1-2.) Clarke's Unopposed Motion to Amend (ECF No. 6) will be granted, and the Clerk will be directed to substitute Kuplinski for Crawford on the docket in this matter.

Kuplinski, as "the one individual with day-to-day control and immediate custody over" Clarke, is a proper Respondent in this matter. Ming Hui Lu v. Lynch, No. 1:15-CV-1100-GBL-MSN, 2015 WL 8482748, at *2 (E.D. Va. Dec. 7, 2015). Kuplinski has not made a formal appearance in this matter. However, because the Court will deny Clarke's petition for lack of merit, the Court concludes that it is unnecessary for Kuplinski to do so.

In the § 2241 Petition, Clarke, an alien detainee in the custody of the United States Immigration and Customs Enforcement ("ICE"), asserts that his continued detention is unlawful under Zadvydas v. Davis, 533 U.S. 678 (2001), because "[t]he government simply has not met its burden of proving a significant likelihood of removal in the reasonably foreseeable future." (§ 2241 Pet. 11.) Respondents assert that Clarke's § 2241 Petition should be denied because "Respondents are taking active steps to effectuate the removal of [Clarke] and anticipate that [Clarke] will be removed to Jamaica within approximately 90 days." (Resp. 2.) For the following reasons, Clarke's § 2241 Petition (ECF No. 1) will be denied.

## I.   PROCEDURAL HISTORY

Clarke is a native and citizen of Jamaica. (§ 2241 Pet. 2.) Clarke entered the United States on a B-2 tourist/visitor visa on or about January 30, 1988. (Resp. Ex. 1 ("O'Neill Decl.") ¶ 8, ECF No. 9-1.) Clarke failed to "timely depart"; therefore, the former Immigration and Nationality Service ("INS") issued an Order to Show Cause on February 4, 1991. (Id.)

On April 9, 1991, an Immigration Judge ("IJ") granted Clarke voluntary departure and, in the alternative, issued an order of removal. (Id. ¶ 9.) Clarke failed to leave the United

States. (Id.) Therefore, the order of removal became final on May 10, 1991. (Id.)

On March 13, 2014, Clarke was arrested by the Metropolitan District of Columbia Police Department for possession with intent to distribute cocaine/crack cocaine. (Id. ¶ 10.) Clarke was later convicted of the charge in the Superior Court for the District of Columbia, and was sentenced to 2 years and 330 days of imprisonment. (Id.) ICE took custody of Clarke on or about April 29, 2015. (Id. ¶ 11.)

On May 11, 2015, a deportation officer ("DO") began the process of obtaining a travel document for Clarke from Jamaica. (Id. ¶ 17.) The DO obtained the necessary paperwork and uploaded it to an electronic travel document database. (Id.) On May 12, 2015, a DO sent a copy of the paperwork to the Jamaican Embassy in Washington, D.C. (Id. ¶ 18.)

On or about May 26, 2015, "the Security Attaché of the Jamaican Embassy interviewed [Clarke]." (Id. ¶ 20.) The Security Attaché asked a DO for additional documents and advised the DO "that the issuance of a travel document was still pending." (Id.) On July 16, 2015, the Security Attaché "advised it could not yet issue an Emergency Certificate (or travel document for [Clarke's] travel to Jamaica without a birth certificate or some other form of a Government of Jamaica-issued identification." (Id. ¶ 25.)

On July 21, 2015, a DO conducted an assessment of whether ICE should continue to detain Clarke, and completed a 90-day Post-Order Custody Review ("POCR"). (Id. ¶ 13.)[2]   The DO recommended that ICE continue to detain Clarke while the Department of Homeland Security ("DHS") continued efforts to obtain a travel document from Jamaica. (Id. ¶ 13.)   Clarke received notice of this decision on July 22, 2015. (Id.)

On August 5, 2015, a DO "gathered [Clarke's] biographical information, photos, and fingerprints" and provided them to the Foreign Service National ("FSN") Investigator for Homeland Security Investigations in Kingston Parrish, Jamaica, to attempt to verify Clarke's identity locally. (Id. ¶¶ 26-27.)   On September 28, 2015, the DO "received notification . . . that the Jamaican Embassy was not able to locate birth records matching the data [Clarke] provided." (Id. ¶ 30.)

On October 9, 2015, the DO learned that the Jamaican Embassy could not provide a travel document "until [Clarke's] nationality could be verified." (Id. ¶ 31.)   The DO "ordered [Clarke's] mother's A-file to determine whether it contained information [Clarke] had failed to provide ICE." (Id.)   The DO was able to locate Clarke's passport number in the A-file.

---

[2] In a POCR, a DO "considers a detained individual's flight risk, any danger the individual may pose to his or her community, and threat to national security." (O'Neill Decl. ¶ 6.)

(Id.) Subsequently, the DO sent Clarke's passport number to the Jamaican Embassy. (Id. ¶ 32.)

On October 22, 2015, the Attaché for Jamaica informed the DO that "he would not be able to verify [Clarke's] citizenship . . . based on a passport number." (Id. ¶ 33.) The Attaché indicated "that the best form of verification is through a birth certificate or record." (Id.) The DO then sent Clarke's passport number to an FSN investigator in Jamaica. (Id.) The investigator "immediately notified [the DO] that it may take some time to verify due to the passport being issued prior to computerization of these records in Jamaica." (Id.)

On October 27, 2015, a DO assigned to Clarke's case completed a Transfer Checklist and provided it to ICE Removal and International Operations ("RIO") so that RIO could make a decision regarding Clarke's continued detention. (Id. ¶ 14.)[3] On November 13, 2015, RIO determined that Clarke would remain

---

[3] The Transfer Checklist is utilized "[i]n cases where an alien has been detained pursuant to removal for 180 days and every 90 days thereafter." (O'Neill Decl. ¶ 7.) The checklist

> contains information, such as the alien's biographical information, whether there is a judicial stay in effect, whether there is a habeas petition pending at the time of review, whether the particular case is a national security case, whether the alien has medical or psychological issues, and whether and how often an Embassy person has been contacted for the status of a travel document.

(Id.)

detained.   (Id.)   Clarke received a copy of that decision on November 16, 2015.   (Id.)

"On November 6, 2015, the FSN investigator suggested applying for genealogical research to verify [Clarke's] citizenship."   (Id. ¶ 34.)   This method was approved on November 13, 2015.   (Id.)   On December 1, 2015, a DO "provided the FSN investigator with [Clarke's] biographical information to assist with the genealogical background research."   (Id. ¶ 36.)

Around January 22, 2016, a DO completed the Transfer Checklist for Clarke's 270-day POCR.   (Id. ¶ 15.)   On January 29, 2016, RIO decided to keep Clarke detained.   (Id. ¶ 16.)

On January 25, 2016, a DO "sent an inquiry to the FSN investigator regarding the status of the genealogical research. She also sent an inquiry to the Jamaican Embassy regarding verification of [Clarke's] birth records."   (Id. ¶ 37.)

On February 5, 2016, a DO interviewed Clarke "to try to gain any new information that could assist ICE in locating identity documents."   (Id. ¶ 38.)   Clarke indicated that his mother and grandmother were deceased, and denied knowing his father.   (Id.)   Clarke provided the names of schools he attended and the name of the hospital where he believed he was born. (Id.)   That same day, "ICE received a birth certificate from the FSN investigator."   (Id. ¶ 39.)

On February 8, 2016, RIO decided to continue Clarke's detention pending receipt of a travel document. (Id. ¶ 40.) On February 19, 2016, the Security Attaché advised ICE "that the Embassy of Jamaica already completed the travel document for a Mr. Clarke, and such document was issued for Mr. Clarke's removal." (Id. ¶ 43.) However, a DO determined that the birth certificate that had been provided to the Security Attaché belonged to a different Mr. Clarke. (Id.) ICE "immediately requested the FSN investigator to conduct another search to locate the correct birth certificate." (Id.)

On February 23, 2016, a DO "arranged for a telephonic interview with the FSN investigator and ICE Assistant Attaché of Removals (AAR) in Kingston, Jamaica" to obtain genealogical information from Clarke. (Id. ¶ 44.) During the interview, Clarke provided "a significant amount of information" regarding schools he attended in Jamaica, as well as additional family history. (Id.) A genealogical research request was submitted that day, and "ICE is expected to receive a birth certificate within 90 days from the government of Jamaica based on this new evidence." (Id.)

According to Assistant Field Office Director O'Neill, "ICE has submitted similar evidence to the government of Jamaica on 81 occasions since September 2015 and has received 61 birth certificates." (Id. ¶ 45.) Once an identity document is

obtained for a Jamaican national, "Jamaica has usually issued a travel document without undue delay." (Id. ¶ 46.) Once ICE receives a travel document, it "generally can arrange an alien's flight to Jamaica and subsequent removal within a short period thereafter." (Id. ¶ 47.)

## II. STATEMENT OF JURISDICTION

Under 28 U.S.C. § 2241, federal courts are authorized to hear cases in which an alien claims that he or she is being detained in violation of the United States Constitution or federal law. See 28 U.S.C. § 2241(c)(3); Zadvydas v. Davis, 533 U.S. 678, 687 (2001).

## III. ANALYSIS

Title 8 U.S.C. Section 1232 governs the detention of aliens after administrative orders of removal have been entered. "During the removal period, the Attorney General shall detain the alien." 8 U.S.C. § 1231(a)(2). The "removal period" is the 90-day period of time that follows the entry of a final order of removal. Id. § 1231(a)(1)(A). Usually, if an "alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General." Id. § 1231(a)(3). Detention may continue, however, "beyond the removal period" for "[i]nadmissible or criminal aliens," as well

8

as those aliens "who ha[ve] been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal." Id. § 1231(a)(6).

This statute and the Constitution do not permit indefinite detention. Section 1231(a)(6), "read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States." Zadvydas v. Davis, 533 U.S. 678, 689 (2001). The Supreme Court has recognized a period of six months of detention as presumptively reasonable under § 1231(a)(6). Id. at 701.

> Thus, under Zadvydas, an alien detained while awaiting removal cannot obtain habeas relief from continued confinement unless he meets a two prong standard. The alien must show (i) that he is being held beyond the presumptively reasonable six-month period, and (ii) that there is no significant likelihood of removal in the foreseeable future.

Menghua Wan v. Crawford, No. 1:13CV1473 (JCC/TRJ), 2014 WL 970180, at *3 (E.D. Va. Mar. 12, 2014) (citing Phillippe v. Willett, No. 1:08cv1167 (JCC), 2009 WL 416053, at *4 (E.D. Va. Feb. 18, 2009)). If the alien makes these prima facie showings, the burden shifts to the government to provide evidence in rebuttal. See Zadvydas, 533 U.S. at 701.

Here, it is undisputed that Clarke has been detained longer than the presumptively-valid six-month period set forth by the Court in Zadvydas. Therefore, the key issue presented is

whether Clarke has demonstrated that there is no significant likelihood that he will be removed in the foreseeable future. Menghua Wan, 2014 WL 970180, at *3 (citing Phillippe, 2009 WL 416053, at *4). As the Zadvydas Court has explained, "for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely [has] to shrink." Zadvydas, 533 U.S. at 701.

> This Court has noted that removal of an alien is not

> 'reasonably foreseeable' in situations where no country would accept the detainee, the country of origin refused to issue the proper travel documents, the United States and the country of origin did not have a removal agreement in place, or the country to which the deportee was going to be removed was unresponsive for a significant period of time.

Tshiteya v. Crawford, No. 1:13cv894 (JCC/IDD), 2013 WL 6635096, at *4 (E.D. Va. Dec. 13, 2013) (citing Nima v. Ridge, 286 F. Supp. 2d 469, 475 (E.D. Pa. 2003)). None of these circumstances exist here.

Clarke asserts that he is not likely to be removed in the foreseeable future because ICE has been aware of his case since March 2014 and has yet to secure a travel document for his return to Jamaica. (§ 2241 Pet. 9-10.) However, contrary to Clarke's assertion: "'[T]he mere passage of time [is] insufficient to meet the petitioner's burden to demonstrate no significant likelihood of removal . . .'" Ming Hui Lu v. Lynch,

10

No. 1:15-cv-1100-GBL-MSN, 2016 WL 375053, at *7 (E.D. Va. Jan. 29, 2016) (alterations and omission in original) (quoting Newell v. Holder, 983 F. Supp. 2d 241, 248 (W.D.N.Y. 2013)). Rather, "removal [is] 'reasonably foreseeable' when . . . ICE [is] taking active steps to secure removal at some point in the future." Menghua Wan, 2014 WL 970180, at *4 (citing Ali v. Barlow, 446 F. Supp. 2d 604, 611 (E.D. Va. 2006)).

Here, the record establishes that ICE has been taking active steps to secure Clarke's removal to Jamaica. In July 16, 2015, the Security Attaché for Jamaica advised ICE that a travel document could not be issued without Clarke's birth certificate or another form of identification issued by the Jamaican government. (O'Neill Decl. ¶ 25.) Since that time, both ICE and Jamaica have worked diligently to locate Clarke's birth certificate. As recently as February 23, 2016, Clarke participated in a telephonic interview with the FSN investigator and the ICE AAR in Jamaica. (Id. ¶ 44.) During the interview, Clarke provided "a significant amount of information" regarding schools he attended in Jamaica, as well as additional family history. (Id.) Based on this new evidence, ICE expects "to receive a birth certificate within 90 days from the government of Jamaica." (Id.) Overall, the record reflects "consistent, periodic contact" between ICE and the Jamaican government. Wray v. Mukasey, No. 08-6042 (WJM), 2009 WL 1834318, at *5 (D.N.J.

June 26, 2009). Such contact negates Clarke's argument that ICE has not done anything to effect his removal to Jamaica in the foreseeable future.

Clarke also contends that he should be released because ICE has failed to "provide any documentation confirming that the Jamaican government has agreed to Mr. Clarke's repatriation." (Reply 2; see also § 2241 Pet. 8.) He cites Agbada v. Ashcroft, No. CIV.A.02-30098-MAP, 2002 WL 1969660 (D. Mass. Aug. 22, 2002), and Mohamed v. Ashcroft, No C01-1747P, 2002 WL 32620339 (W.D. Wash. Apr. 15, 2002),[4] to support his argument that Respondent fails to demonstrate his removal will occur in the reasonably foreseeable future. (§ 2241 Pet. 8.) In Agbada, the court denied the respondent's motion to dismiss and found that the respondent provided "no confidence as to when, or even whether, the petitioner will ever be repatriated" based on a vague assurance "that [removal] applications are "'usually approved in the end' [but] sometimes they may not be." 2002 WL 1969660, at *1. In Mohamed, the court granted relief after finding that the petitioner "ha[d] provided good reason to believe that he will not be removed in the reasonably foreseeable future," and because the respondents had "offered no specific information regarding how or when they expect[ed] to obtain the necessary documentation or cooperation from the

---

[4] Clarke refers to this case as Abdu v. Ashcroft in his § 2241 Petition. (§ 2241 Pet. 8.) Abdu, however, is the first name of the petitioner in that case.

Ethiopian government."   2002 WL 32620339, at *1.   As the court

noted,

> [d]espite Mr. Mohamed's cooperation with the INS in
> requesting travel documents and participating in an
> interview with the Ethiopian consulate, the Ethiopian
> embassy refuses to respond.   The only evidence before
> the Court that the Ethiopian government at some point
> may respond is the INS' assertion that in some other
> cases the Ethiopian government has provided the
> necessary travel authorization for other persons.

Id.

Both Agbada and Mohamed are easily distinguishable from

Clarke's detention.   As set forth in detail supra in Part I,

both ICE and the Jamaica government have actively been working

together to obtain Clarke's birth certificate so that travel

documents can be issued.   The Jamaican government has responded

to ICE's requests within reasonable periods of time.   Moreover,

when the FSN investigator believed Clarke's birth certificate

had been located on February 5, 2016, the Jamaican government

readily issued a travel document within the following two weeks.

(O'Neill Decl. ¶¶ 39, 43.)   Although that birth certificate

actually belonged to a different Mr. Clarke, Clarke simply has

not demonstrated that Jamaica would hesitate to issue a new

travel document once the correct birth certificate is located.

Accordingly, Clarke has failed to meet his burden of

demonstrating that his removal to Jamaica is not reasonably

foreseeable.

Clarke further argues that "it appears as though ICE has not followed through with the appropriate procedures set forth in 8 C.F.R. § 241.4 in determining the status of Mr. Clarke's custody." (§ 2241 Pet. 9.) Clarke argues that he 'does not appear to have gotten notice of his custody review, and as such, did not have the opportunity to provide information in support of his release." (Id.) Moreover, Clarke argues that "correspondence regarding the custody review was not provided to counsel's office until it was requested." (Id.) Here, Clarke confuses his "substantive rights under Zadvydas and his procedural rights, the violation of which [does] not justify granting habeas relief." Ming Hui Lu, 2016 WL 375053, at *8 ("'When no substantive due process violation has been established, release from detention seems an inappropriate remedy for alleged violations of the procedural protections afforded removal aliens such as petitioner.'" (quoting Idowu v. Ridge, No. 3:03-cv-1293-R, 2003 WL 21805198, at *4-5 (N.D. Tex. Aug. 4, 2003))). Thus, because Clarke's substantive rights under Zadvydas have not been violated, granting habeas relief for these alleged procedural failures "is an extreme, and thus inappropriate remedy in this case." Id.

## IV.   CONCLUSION

For the foregoing reasons, Clarke's § 2241 Petition (ECF No. 1) will be denied.   Clarke's Unopposed Motion to Amend (ECF No. 6) will be granted.   The Clerk will be directed to substitute John R. Kuplinski, Superintendent of the Virginia Peninsula Regional Jail, for Respondent Jeffrey Crawford, Director of the Farmville Detention Center.   The action will be dismissed.

The Clerk is directed to send a copy of the Memorandum Opinion to counsel of record.

It is so ORDERED.

_____/s/_____   _REP_

Robert E. Payne
Senior United States District Judge

Date:  _April 25, 2016_
Richmond, Virginia

15